[No. B222061. Second Dist., Div. Seven. Oct. 18, 2010.]

In re DANNY HARE on Habeas Corpus.

COUNSEL

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien, Julie A. Malone, Kathleen R. Frey and Michael Rhoads, Deputy Attorneys General, for Appellant State of Califonia.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Respondent Danny Hare.

OPINION

**PERLUSS, P. J.**—Danny Hare, sentenced in 1985 to an indeterminate term of 15 years to life in state prison for second degree murder, became eligible for parole in August 1992. The Board of Parole Hearings (Board) granted Hare parole in January 2009. However, the Governor, exercising his authority under article V, section 8, subdivision (b), of the California Constitution and Penal Code section 3041.2, reversed the Board's decision. In December 2009 the superior court granted Hare's petition for a writ of habeas corpus, finding the Governor's reversal was untimely and not supported by "some evidence" that Hare currently posed an unreasonable risk of danger to society if released. The warden of the California State Prison, Solano, where Hare is incarcerated, appeals. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Commitment Offense; Hare's Fugitive Status and Plea After Arrest; Imposition of Sentence*

On August 15, 1980 Hare, then a 27-year-old drug abuser,[1] shot his drug supplier, Oscar Ramos, while purchasing cocaine. At his 2008 parole suitability hearing Hare explained his "motives were . . . greed for the cocaine and money, clouded by a terrible drug habit and [I was also] full of anger and rage at the same time and misplaced projection of blame of . . . my addiction upon Oscar." According to Hare, his anger was due, in part, to the fact his wife had recently begun marriage dissolution proceedings.

After the murder Hare enlisted his girlfriend and 15-year-old brother, who were living at the house where Hare had shot Ramos, to help him clean up the crime scene, telling them a third party had killed Ramos. Hare and his brother buried Ramos's body in the desert.

Hare was arrested in November 1980. After he was released on bail, Hare married his girlfriend and fled the state. Hare and his new wife ultimately moved to Washington, where he lived under a false identity until November 1983 when his wife, tired of living as a fugitive, notified the authorities.

---

[1] Hare began smoking marijuana when he was 19 years old. At 21 he began using barbiturates and later amphetamines, LSD and cocaine. Prior to the commitment offense Hare had been arrested in Missouri for possession of amphetamines, for which he received a three-year suspended sentence, and cited for possession of marijuana (Health & Saf. Code, § 11357, subd. (b)), for which he paid a fine. At the time of the commitment offense Hare was addicted to cocaine, but had stopped using other drugs.

Hare was charged with murder while engaged in the commission of robbery. (Pen. Code, § 190.2, subd. (a)(17).) He pleaded guilty to second degree murder and was sentenced to an indeterminate term in state prison of 15 years to life.

### 2. *Hare's Prison Record*

#### a. *Disciplinary record*

During his incarceration Hare received three serious misconduct violations (reported on CDC form 115 and commonly referred to as a 115). The most recent violation occurred in October 2002 when correctional officers discovered an altered toothbrush in Hare's cell.[2] The rules violation report, which charged Hare with possession of a dangerous weapon, stated, "The toothbrush confiscated was similar and fashioned the same as two (2) other weapons recently found in L-3. . . . I examined the toothbrush and observed that the cut behind the bristles appeared to be cut with a handsaw or an electric saw. This conclusion and observation was based on the fact that the cut behind the bristles was very straight and clean. These types of tools are located in the Prison Industries Authority (PIA) where Inmate Hare is currently assigned."

Hare denied the charge. At a November 17, 2002 disciplinary hearing Hare admitted he possessed the toothbrush but explained, "I did not know that a toothbrush with a slit in it could be consider[ed] a dangerous weapon." The hearing panel found Hare guilty of the amended (lesser) charge of possession of dangerous contraband.

At his 2007 and 2008 parole suitability hearings Hare explained to the panel he had altered the toothbrush to clean his hairbrush and wire fan. Hare told the panel in 2007 he had appealed the 115 "all the way through the whole system and all the way up into the eastern district," where it was then still pending. He complained it was "hypocritical or marginal at best" that the prisoners' standard-issue toothbrush had a slit in the handle, "which is already a ready-made weapon stock," but he could be disciplined for possessing a toothbrush that he contended he had altered for cleaning purposes.

#### b. *Participation in rehabilitation, college courses and other programs and laudatory reports*

As both the Board and Governor have acknowledged, Hare has made significant efforts to improve himself while in prison and to enhance his

---

[2] In 1987 Hare received two 115's for damaging or destroying state property: the first in August for using a sheet to block his window; the second in September for altering two pairs of state-issued shorts.

ability to obey the law upon release. Hare earned an associate in arts degree in 1990, has obtained a certificate in biblical studies and has completed vocational programs in electrical, mill and cabinet, airframe, air powerplant and lens manufacturing and fitting, as well as an employment workshop. Hare received laudatory reports for his work in the PIA (California Prison Industry Authority) optical lab, which commended him for his positive behavior, sincere attitude, professionalism and work ethic.

Hare has also participated in numerous therapeutic and other self-help programs, including stress management, emotional awareness and healing, parolee recidivism prevention and creative conflict resolution. Hare has been sober since November of 1980, about the time he was first arrested, and has participated in Narcotics Anonymous since 1989.

### 3. *Hare's 2008 Psychological Evaluation*

In July 2008 Dr. Geca submitted a psychological evaluation of Hare to the Board. Dr. Geca found Hare "has a significant history of drugs and alcohol abuse and meets full necessary criteria for the Polysubstance Dependence in a controlled environment (which also in this case suggests a state of remission)." Regarding Hare's potential dangerousness, Dr. Geca concluded, consistent with prior psychological evaluations, he was "at the *low* level of recidivism" for future violence if released.

### 4. *Hare's Parole Plans*

In November 2007 Hare was accepted into a 12-month residential treatment program with the Union Rescue Mission in Los Angeles upon his release from prison. The program, at no cost to Hare, will provide him with food, clothing and housing. Hare will also be offered educational programs and counseling services, including anger management, spiritual and emotional development, vocational education and work therapy, physical education, substance abuse recovery, random drug testing and religious worship. After graduating from the yearlong program, Hare may become an apprentice with the mission, earning a stipend, or enter the transitional program, allowing him to continue living rent free while seeking work.

### 5. *The Board's Determination Hare Is Suitable for Parole; the Letter to Hare Informing Him the Board's Decision Became Final on January 20, 2009*

After a number of adverse decisions, including in 2005 and 2007, on September 8, 2008 a Board panel for the first time found Hare suitable for parole. The panel concluded Hare would not pose an unreasonable risk of

danger to society if released, finding he had shown signs of remorse, taken responsibility for the crime and, during his 23 years of incarceration, had "enhanced his ability to function within the law upon release through participation in educational program[s], self-help, vocational programs, and institutional job assignments," becoming "a model of propriety in this institutional environment." The panel further found Hare, whose risk factors for violence at the time of the commitment offense (that is, a dysfunctional and unstable family history, impulsivity, antisocial attitudes and poor judgment) were greatly increased by severe substance dependence, had been sober throughout his incarceration and had internalized the tools necessary to maintain sobriety. Finally, the panel found Hare had realistic parole plans and marketable skills.

In a letter dated February 2, 2009 Linn Austen, chief of the Board's "Decision Processing and Scheduling Unit," informed Hare, "Decision Review is completed and the final decision date of your hearing is January 20, 2009. . . . [¶] Therefore, the decision finding you suitable for parole may be subject to review by the Governor. [¶] Attached is the last 'Decision Page' with the stamped file date and a front cover sheet to your transcript." Consistent with the letter, the date stamped on the transcript after the typed phrase "THIS DECISION WILL BE FINAL ON:_____" was January 20, 2009.

### 6. *The Governor's Reversal*

On February 20, 2009 the Governor reversed the Board's decision, concluding, notwithstanding the positive factors considered,[3] Hare "still poses a risk of recidivism and violence, and that his release from prison at this time would pose an unreasonable risk to public safety." After describing the murder as especially atrocious because Hare's motive was trivial in relation to the magnitude of the crime, the Governor explained the steps Hare took to cover up the crime and the fact he fled the state while released on bail and lived under a false identity in Washington for three years "indicate[] to me that Mr. Hare is a person who tries to avoid responsibility for his crime and takes elaborate steps to hide the truth."

The Governor found Hare's "inclination to hide the truth and avoid responsibility" surfaced again when Hare was disciplined for possession of

---

[3] The positive factors considered by the Governor, who acknowledged Hare had "enhanced his ability to function within the law upon release," included Hare's educational and vocational accomplishments, his participation in numerous self-help and therapy programs and his "seemingly solid relationships and close ties with a supportive family and friends during his incarceration."

the altered toothbrush.[4] The Governor explained, "According to the information in the confidential file, Mr. Hare said he used the altered toothbrush 'to clean his comb.' But he told his 2008 mental health evaluator that he modified the toothbrush to 'clean his fan.' The evaluator appears to have accepted this explanation, and observed that Mr. Hare 'has not been a management problem or concern,' but I do not accept Mr. Hare's changing story or his explanation for having altered a toothbrush. His history of avoiding responsibility and covering up the truth indicates to me that he is not yet ready to follow the rules on parole and still poses a risk to society if released at this time."

Finally, the Governor was concerned Hare's parole plan did not include an offer of employment even though the panel had urged him at the 2007 parole hearing to develop an employment plan. Although the Governor acknowledged Hare had obtained vocational skills in prison that would assist him in finding a job, the Governor believed, "having a stable means to support himself immediately upon release from prison will be essential to his success on parole."

### 7. The Petition for Writ of Habeas Corpus

In August 2009 Hare petitioned for writ of habeas corpus, contending the Governor's reversal was untimely because it had been made one day after the 30-day period for the Governor's review had passed and, even if timely, was not supported by any evidence he continued to pose an unreasonable risk to public safety. In his return to the superior court's order to show cause, the warden argued the reversal was timely because the Board's decision was not final until January 21, 2009—120 days after the date of the hearing pursuant to Penal Code sections 3041, subdivision (b), and 3041.2, not January 20, 2009 as Hare had been informed—and the Governor's reversal was made within 30 days of January 21, 2009. Although the warden's argument as to timeliness appeared to be based solely on his interpretation of the relevant statutes and regulations, the warden provided the court with a copy of the transcript from the 2008 parole consideration hearing that differs from Hare's in one significant respect: The final page of the decision states, "**THIS DECISION WILL BE FINAL ON: January 21, 2009.**" The warden, however, did not provide the superior court with a citation to this page of the exhibit or refer to it in his return or supporting memorandum.

On December 24, 2009 the superior court granted Hare's petition, finding the Governor's reversal was untimely and thus a "legal nullity because the

---

[4] The Governor mistakenly characterized the 115 as "possession of an inmate-manufactured weapon," not the reduced charge of "possession of dangerous contraband" that was ultimately sustained.

Governor lacked the jurisdiction to intervene in the matter." The court explained, "[T]here is nothing in either the controlling statute or regulation to indicate that Board decisions only become final on the 120th day after a parole hearing. Instead, the statute and the regulation are both set forth in terms that explicitly envision decisions which become final before the 120th day. Here, the Board decided to finalize its decision on the 119th day. That decision was permissible under the law, and the Governor's jurisdictional window opened on January 20, 2009. Accordingly, it closed on February 19, 2009."

The court also found the Governor's decision was not supported by "some evidence" Hare continued to pose an unreasonable risk to public safety notwithstanding the heinousness of the commitment offense, as required by *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*). The court explained Hare's possession of the altered toothbrush seven years earlier was his only act of misconduct since 1987 and was not probative of current dangerousness: "Just like the commitment offense, [Hare's] single act of prison misconduct in the last 22 years is an immutable fact of [Hare's] history, and its relevance to [Hare's] risk of current dangerousness has grown stale over the last seven years. [Citation.] The Court finds that on the basis of this institutional record, there is no rational nexus between [Hare's] institutional behavior and his current dangerousness."

With respect to Hare's lack of a specific employment offer, the court found it did "not support a finding that he remains a current threat to public safety." The court explained, "The law requires that a prisoner have made realistic plans for release or has developed marketable skills that can be put to use. [Citation.] The Governor does not dispute that [Hare] has realistic housing plans and there is ample evidence in the record which was considered by the Board to support a finding that he has marketable skills. [Hare] has obtained five vocational certifications, including one in optical lens making as recently as 2006, and has researched numerous private employers who hire ex-inmates in the lens-making field. Even if he does not have a firm job offer, [Hare] does have both a housing plan and marketable skills as required by the regulations."

8. *The Superior Court's Denial of the Warden's Motion for Reconsideration*

The warden moved for reconsideration on grounds including that new information established the Governor's reversal was timely. The warden argued, and submitted to the court, a memorandum to the Governor's office by the Board

transmitting the record considered by the Board during the 2008 hearing, stating, "The Governor's review deadline is **February 20, 2009**." The court denied the motion.

## DISCUSSION

### 1. *Governing Law*

As the California Supreme Court and Courts of Appeal have repeatedly stated in decisions reviewing denials of parole by the Board or the Governor, the purpose of parole is to help prisoners "reintegrate into society as constructive individuals as soon as they are able," without being confined for the full term of their sentences. (*Morrissey v. Brewer* (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593].) Parole release decisions are essentially discretionary; they "entail the Board's attempt to predict by subjective analysis" the inmate's suitability for release on parole. (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.) That prediction requires analysis of individualized factors on a case-by-case basis, and the Board's (and, ultimately, the Governor's) discretion in that regard is " ' "almost unlimited." ' " (*Ibid.*)

Notwithstanding the breadth of that discretion, however, Penal Code section 3041,[5] which governs the substance and procedure for the Board's parole release decisions, creates a cognizable liberty interest in parole protected by the due process clause of the California Constitution. (Cal. Const., art. I, § 7, subd. (a); *Lawrence, supra,* 44 Cal.4th at p. 1205 ["the judiciary is empowered to review a decision by the Board or the Governor to ensure that the decision reflects 'an individualized consideration of the specified criteria' and is not 'arbitrary and capricious' "].)

As an inmate's minimum eligible parole release date approaches, Penal Code section 3041, subdivision (b), requires the Board to set a release date "unless it determines . . . that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed." In making its decision the Board must

---

[5] Penal Code section 3041, subdivision (a), provides, "One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

consider all relevant, reliable information. Factors tending to indicate suitability include (1) the absence of a juvenile record, (2) stable social history, (3) signs of remorse, (4) significant life stress motivated the crime, (5) battered woman syndrome, (6) no significant history of violent crime, (7) inmate's age, (8) realistic plans for the future, and (9) institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Circumstances tending to show unsuitability include (1) commitment offense was committed "in an especially heinous, atrocious or cruel manner,"[6] (2) previous record of violence, (3) unstable social history, (4) sadistic sexual offenses, (5) psychological factors, and (6) serious misconduct while incarcerated. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

In exercising its discretion, the Board "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*Lawrence, supra*, 44 Cal.4th at p. 1219.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Id.* at p. 1212.)

The Board can, of course, rely on the aggravated circumstances of the commitment offense as a reason for finding an inmate unsuitable for parole; however, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his . . . current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his . . . commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.)

■ Once the Board sets a parole date, the California Constitution empowers the Governor to review the parole decision of an inmate who has been convicted of murder and sentenced to an indeterminate prison term. (Cal. Const., art. V, § 8, subd. (b).)[7] The Governor's decision to affirm,

---

[6] The regulation specifies the factors to be considered in determining whether the offense was committed in an especially heinous, atrocious or cruel manner as: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

[7] Article V, section 8, subdivision (b), of the California Constitution provides, "No decision of the parole authority of this State with respect to the granting, denial, revocation, or

modify or reverse the decision of the Board rests on the same factors that guide the Board's decision (Cal. Const., art. V, § 8, subd. (b)) and must be based on "materials provided by the parole authority." (Pen. Code, § 3041.2, subd. (a).)[8] "Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 660–661.)

### 2. *Standard of review*

■ "[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra,* 44 Cal.4th at p. 1212; see *id.* at p. 1213 ["[E]vidence in the record corresponding to both suitability and unsuitability factors . . . must, by statute, be considered and relied upon by both the Board and the Governor . . . . By reviewing the evidence, a court may determine whether the facts relied upon by the Board or the Governor support the ultimate decision that the inmate remains a threat to public safety."].)[9] The standard is "unquestionably deferential," and " '*limited to ascertaining whether there is some evidence in the record that supports the Governor's decision.*' " (*Lawrence,* at p. 1210, italics added; accord, *In re Shaputis* (2008) 44 Cal.4th 1241, 1258 [82 Cal.Rptr.3d 213, 190 P.3d 573] ["[w]hen a court reviews the record for some evidence supporting the Governor's conclusion that a petitioner currently poses an unreasonable risk to public safety, it will

suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

[8] Penal Code section 3041.2 provides, "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

[9] As the warden argues in his reply brief and contrary to a suggestion advanced at oral argument, in reviewing the Governor's decision under *Lawrence,* we properly look not only to those factors specifically identified as the basis for the Governor's decision but also to factors "not expressly advanced" as grounds for the unsuitability finding where "there is an implication in the Governor's statement . . ." that the factors supported the unsuitability finding. (*Lawrence, supra,* 44 Cal.4th at p. 1223.)

affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors"].) Nonetheless, the standard "certainly is not toothless, and 'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Lawrence*, at p. 1210.)

We review de novo an appeal from the superior court's decision to grant the petition for writ of habeas corpus that, as here, was based solely on documentary evidence. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

### 3. *The Governor's Reversal of the Board's Decision Was Timely*

A decision by a Board panel finding an inmate suitable for parole becomes final "within 120 days of the date of the hearing." (Pen. Code, § 3041, subd. (b); see also Cal. Code Regs., tit. 15, §§ 2041, subd. (h) ["[a]ny proposed decision of the panel shall become final within 120 days of the hearing"], 2043 ["[a]ny proposed decision granting, modifying, or denying a parole date for a life prisoner, exclusive of those made during Progress Hearings, shall become final no later than 120 days after the hearing at which the proposed decision was made"].) During the 120-day period, the Board may review the panel's decision. (Pen. Code, § 3041, subd. (b).)[10] Once final, the Governor has 30 days to review a decision granting parole to an inmate serving an indeterminate life sentence for murder. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2, subd. (a); see *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1474 [8 Cal.Rptr.2d 492] ["Governor's authority to review a parole decision commences on the effective date of the [Board's] decision."].)

In the case at bar there is a dispute as to the final, or effective, date of the Board's decision. Hare contends the effective date was January 20, 2009, 119 days after the panel's parole suitability hearing, as evidenced by the letter to him from Linn Austen and the date stamped on the last page of the panel decision accompanying the letter. The Governor contends the information provided to Hare was a clerical error and the effective date was January 21, 2009, 120 days after the hearing, as reflected on the warden's copy of the decision and further supported by the memorandum from the Board to the Governor stating the Governor's review deadline was February 20, 2009.[11] However, before the superior court the warden presented only a legal

---

[10] No separate or different finality date has been created for a Board decision modifying the panel's decision.

[11] As discussed, the superior court was not directly presented with this conflict before making its decision. Although the court was provided with the warden's copy of the transcript

argument, insisting the parole decision was not final for 120 days whether or not the panel had indicated an earlier effective date—an argument the court rejected.[12]

■ We need not address whether the superior court correctly rejected the warden's statutory argument because the conflict in the evidence regarding the effective date of the Board decision, if properly presented to the superior court, should have been resolved in favor of the warden. There is a presumption that official duties have been regularly performed. (Evid. Code, § 664 ["[i]t is presumed that official duty has been regularly performed"].) That presumption may be rebutted when "irregularity is clearly shown." (*In re Elsholz* (1964) 228 Cal.App.2d 192, 197 [39 Cal.Rptr. 356]; see *People v. Martinez* (2000) 22 Cal.4th 106, 125 [91 Cal.Rptr.2d 687, 990 P.2d 563] ["presumption 'affect[s] the burden of proof' [citation], meaning that the party against whom it operates . . . has 'the burden of proof as to the nonexistence of the presumed fact' "].) Irregularity has not been clearly shown here. Indeed, the notion the Governor could be deprived of his constitutional authority to review parole decisions for inmates—established by a 1988 voter amendment to the California Constitution (*Rosenkrantz, supra,* 29 Cal.4th at pp. 658–659)—by what appears to be a clerical error would be an unwarranted thwarting of the will of the people. Thus, the presumption favoring resolution of the evidentiary conflict to support the conclusion that timely action was taken is especially appropriate in this situation.[13]

---

from the hearing and decision—110 pages with the date of decision on page 109—the warden failed to identify this conflicting date in his briefs or to provide any citation to it.

[12] The warden did refer to the conflicting evidence, and particularly the memorandum to the Governor, in his motion for reconsideration. The superior court could have reasonably concluded the memorandum simply reflected the warden's position the Board's decision would not be final until 120 days after the panel hearing regardless whether it had stated an earlier effective date.

[13] Even if the Governor had missed the deadline by one day because of confusion as to the date on which the 30-day period expired, it would not necessarily deprive the Governor of jurisdiction to review the parole decision. Not all statutory time limits are mandatory and jurisdictional. (See *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1147 [43 Cal.Rptr.2d 693, 899 P.2d 79] ["[w]hen the Legislature has specified a time within which an administrative board is to render a decision, that time limit may be mandatory in the obligatory sense, but this 'does not necessarily mean that a failure to comply with its provisions causes a loss of jurisdiction' "]; cf. *People v. Allen* (2007) 42 Cal.4th 91, 101–105 [64 Cal.Rptr.3d 124, 164 P.3d 557] [time provision held mandatory but its violation did not deprive court of fundamental jurisdictional]; see generally 2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 103, pp. 676–678 [ explaining whether statutes of limitations and other time provisions are "mandatory" or "directory"].) Similarly, a one-day delay in the exercise of the Governor's constitutional authority to review parole decisions does not necessarily implicate an inmate's due process rights. The liberty interest in parole protected by the due process clause of the California Constitution requires that denial of parole be supported by some evidence of current dangerousness after individualized consideration of the specified

### 4. The Governor's Decision to Reverse the Board's Grant of Parole Is Supported by "Some Evidence" Hare Continues to Pose a Threat to Public Safety

The superior court did not dispute, and we agree, at least some evidence supports the Governor's determination the murder of Oscar Ramos during the course of a drug transaction was especially atrocious because the motive for the crime—greed for a relatively small sum of money (approximately $4,400) and drugs—was trivial in comparison to its magnitude. Accordingly, the limited question before us is whether the Governor reasonably interpreted Hare's possession of an altered toothbrush, his differing explanations for it and his lack of a job offer upon release as evidence that, together with the gravity of the commitment offense, is probative of his current dangerousness. (See *Lawrence, supra,* 44 Cal.4th at p. 1212 ["under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public"].)

Bearing in mind the extremely limited and deferential standard of judicial review in parole cases, we conclude some evidence in the record supports the Governor's decision that Hare remains dangerous. To be sure, the Governor's explanation Hare's likelihood of success on parole was jeopardized because he did not have an offer of employment and needed "a stable means to support himself immediately upon release" appears suspect. Hare has been admitted into a yearlong treatment program that will provide him with shelter, food, counseling and educational programs at no cost. The program also provides transitional services after Hare graduates until he is able to support himself. Thus, Hare does not need a job to support himself immediately upon release.[14]

criteria (see *Lawrence, supra,* 44 Cal.4th at p. 1205; *In re Prather* (2010) 50 Cal.4th 238, 251 [112 Cal.Rptr.3d 291, 234 P.3d 541] ["petitioner is entitled to a constitutionally adequate and meaningful review of a parole decision . . ."]), not that review be completed or the inmate released on a particular date. Indeed, even when a Board decision denying parole is not supported by some evidence in the record, the remedy is not immediate release, but remand to the Board for reconsideration of the full record. (See *In re Prather,* at p. 258 ["although a reviewing court may expressly limit the Board's reliance upon evidence the court already has considered and rejected as insufficient, the court should avoid issuing directives that improperly limit the Board's statutory authority to review and evaluate the *full* record—including evidence previously considered by the Board, as well as additional evidence not presented at prior parole hearings"].) As discussed, however, we properly leave resolution of these issues to another case.

[14] *In re Cerny* (2009) 178 Cal.App.4th 1303 [101 Cal.Rptr.3d 200], cited by the warden, presented quite a different situation. Cerny, who had an extensive history of drug abuse before his incarceration for murder, had marketable skills but did not have an offer of employment or

Additionally, the Governor's characterization of Hare's slightly differing explanations on separate occasions that he used the altered toothbrush to clean his wire fan and hairbrush as a lie demonstrating he continues to "hide the truth and avoid responsibility" seems unduly harsh. As the superior court observed, "the two uses are clearly not mutually exclusive." Nevertheless, the Governor also rejected Hare's explanation he modified the toothbrush as a cleaning tool (to clean either his fan or his brush), implying Hare possessed it for use as a weapon or was in the process of fabricating a weapon. This is not an unreasonable interpretation of the evidence. (See *In re Shaputis, supra*, 44 Cal.4th at p. 1258 [court "will affirm the Governor's interpretation of the evidence so long as that interpretation is reasonable and reflects due consideration of all relevant statutory factors"].) The 115 report stated the altered toothbrush was "similar and fashioned the same as two (2) other weapons recently found," and Hare's explanation he did not know the retooled toothbrush could be considered a dangerous weapon lacks credibility. Given his lengthy incarceration, it is simply unbelievable Hare did not know that fashioning a weapon out of a toothbrush (see *People v. Wallace* (2008) 44 Cal.4th 1032, 1081 [81 Cal.Rptr.3d 651, 189 P.3d 911] ["a bare razor blade could be affixed to an object, such as a toothbrush, to create a weapon"]) is not uncommon in prison or that altering a toothbrush, even for benign purposes, was likely to result in disciplinary action if discovered. Moreover, it is difficult to envision how placing a slit in the toothbrush as Hare did would render it more effective as a cleaning utensil. Indeed, although Hare was convicted of possession of dangerous contraband, not possession of a dangerous weapon, Hare's appeal of the 115 was apparently not successful, suggesting correctional authorities also did not find his explanation of benign use plausible.

█ Although we reverse the order granting Hare's petition for a writ of habeas corpus, we agree with the superior court that Hare is a strong candidate for release on parole; and the Board's decision to release him was certainly reasonable. In fact, were it our responsibility to evaluate the various factors appropriate to a determination whether Hare constitutes a current threat to public safety, we might very well conclude that evidence in the record tending to establish his suitability for parole far outweighs any evidence demonstrating unsuitability for parole. Nonetheless, the Governor did not act arbitrarily or capriciously in reversing the grant of parole in this case: There is at least a modicum of evidence in the record—Hare's

---

confirmed admittance into the residential drug treatment facility that had indicated a willingness to assist him. (*Id.* at pp. 1313–1314.) The court, acknowledging its limited power of review, reluctantly found Cerny's uncertain plan for employment, housing and drug treatment were some evidence supporting the Board's denial of parole. (*Id.* at p. 1315.) Here, however, Hare has a solid plan for housing and treatment and, as discussed, does not need employment for at least a year, at which time he will be assisted in making the transition to gainful employment.

possession of the altered toothbrush—supporting the Governor's conclusion that the circumstances of the commitment offense continue to be predictive of current dangerousness despite the many positive factors that demonstrate Hare's suitability for parole. (See *Lawrence, supra*, 44 Cal.4th at p. 1226 ["[o]ur deferential standard of review requires us to credit the Governor's findings if they are supported by a modicum of evidence"].) Although the superior court found the 2002 violation's relevance to Hare's risk of current dangerousness had waned over time, we cannot agree that in the context of this particular violation seven years is too old to be probative. That is precisely the kind of balancing and weighing that is left to the Board's and the Governor's discretion.

In sum, the Governor's decision Hare is unsuitable for parole is supported by some evidence. Accordingly, the superior court erred in granting Hare's petition for writ of habeas corpus and vacating the Governor's reversal of the Board's grant of parole.

## DISPOSITION

The superior court's order vacating the Governor's reversal of the Board's decision granting parole, reinstating the Board's decision and directing Hare's immediate release is reversed.

Zelon, J., and Jackson, J., concurred.

Petitioner's petition for review by the Supreme Court was denied February 16, 2011, S188422.