[No. A131580. First Dist., Div. Three. May 18, 2012.]

In re JAMES HUNTER on Habeas Corpus.

**COUNSEL**

Michael Evan Beckman for Petitioner James Hunter.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Julie A. Malone and Amber N. Wipfler, Deputy Attorneys General, for Respondent The People.

## OPINION

**POLLAK, J.**—Petitioner James Hunter seeks habeas corpus relief from the denial of parole by respondent Board of Parole Hearings (the Board). After carefully considering the restatement of the governing principles of review in *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*) we do not find "some evidence" to support the Board's conclusions or an articulation of a rational basis for finding that Hunter would pose an unreasonable risk to public safety if paroled. Therefore, we remand the matter to the Board for reconsideration in light of this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1985, Hunter pled guilty to the first degree murder of Tanya Hamlin and to the concurrent second degree murder of her fetus. He was sentenced to a term of 25 years to life, plus one year for a weapons enhancement and a five-year term for robbery. He entered prison on September 24, 1985, and became eligible for parole on August 18, 2004. On September 10, 2009, the Board denied him parole and set his next parole hearing in seven years.

The circumstances of Hunter's life crime are these. On the evening of October 26, 27, 1984, Hunter was snorting and freebasing cocaine with friends. He left the group to buy more cocaine from James Hamlin. Hunter did not find Hamlin, but did find Hamlin's sister, Tanya, at her house. Tanya answered the door in a gown and invited Hunter in. She had not seen her brother all day and was not certain when he would return. Tanya's five-year-old son was asleep on the couch in the living room, so Hunter and Tanya talked in her bedroom. The two had grown up together, had a past romantic relationship and, although Hunter knew that Tanya then had another boyfriend, he stated they "still had feelings for one another."

After approximately half an hour of conversation, Tanya and Hunter had sex. Afterwards, Tanya gave Hunter $10 and he left to purchase some fast food. Hunter knew that Tanya's brother stored his cocaine at her house and, according to Hunter, when he returned he formed a plan to get the drugs. He retrieved a six-inch knife from his car and, he has consistently maintained, brought it into the apartment for the purpose of scaring Tanya into giving him the drugs if she would not sell them to him.

When Hunter demanded the drugs, Tanya refused, claiming she could not "go in his stuff" and not to know where they were anyway. After unsuccessfully attempting to cajole her, he became angry and pushed her onto the bed. According to the account Hunter gave to the Board's psychologist: "As I was leaving, she came up and slapped me across my face and called me a punk or

something. She grabbed me in the area of the left eye and gripping me. I had my knife and I turned around and swung. I stuck her in the chest. I slowed down and I just touched her. She started going at me. I had the knife in my hand and used that arm to press against her neck and she was facing away from me. She reached up behind me and grabbed my hair. She was digging her nails into my scalp and pulling my hair real hard. I dropped the knife and reached my hand over real quick and grabbed her by the neck. She was still holding on tight, I squeezed her hard, but she wouldn't let go. I knelt down with her and squeezed her harder. She was gasping. Then I pulled her head down and then it felt like she pulled some of my hair out. I pushed her and I stood up. I still didn't say nothing. She looked back and got up and she had the knife. She came and swung the knife at me. I grabbed her hand and squeezed her hard and got the knife out of her hand. I stuck her on the side somewhere. I turned around and poked her on the side with the knife. I pushed her down and she fell to the floor with her eyes open. That was it." Hunter provided substantially the same account to the Board, except he stated that he attempted to leave after their initial physical altercation. In both accounts, he related that after killing Tanya he found and took the cocaine, along with some jewelry to make it appear like a burglary.

In response to questions from the Board, Hunter stated that Tanya died from "stab wounds" on her left side, possibly from a kidney injury. When the deputy commissioner sought to confirm that Hunter had stabbed her on the left side, he replied: "Yeah, the left side. That was definitely the puncture wound. And I hit her in her chest, made a big scratch." When asked how many times he stabbed her, he replied: "I would say, I know in her chest. I'm not for sure if I hit her twice in her chest, but I know I hit her definitely once on her side that I remember." When asked if he verified that she was dead, he said, "I was just swinging. I don't think I thought that through at the time, to make sure she was dead. But it was all a part of the, in the midst of the struggle." When later asked whether he might have inflicted as many as seven stab wounds, Hunter replied: "It could be. I just know of two or three major punctures that I did. I don't know if the rest was scratches or actual stab wounds. I mean, you know, puncture or cuts. I'm not for sure. Is stab wounds considered cuts too? Is it all the same? Then it may be so." Hunter was uncertain whether Tanya's body had any marks from being beaten, but he agreed there was a "great possibility" it did. When asked whether he had strangled her, he replied that he was not sure if that had been a cause of death, but admitted he "definitely choked her."

The record explores Hunter's background, including his prior use of drugs, which began at the age of 12 or 13. Initially he smoked marijuana and drank alcohol, but later progressed to smoking cocaine. He denied ever taking drugs intravenously. He considered himself a drug addict. According to his psychological evaluation, Hunter "has learned about addiction and at this time his

ability to refrain from future use in the free community is good." In discussing his impulsivity and behavior control, the psychologist indicated Hunter has made considerable progress and currently "displays very little impulsivity."

Prior to the commitment offense, Hunter had no juvenile or adult convictions, but he had been arrested in 1984 for possession of drugs for sale. While incarcerated he received three serious discipline rules violation reports, none of which involved violence. Two were in 1987 for disobeying orders. The most recent occurred in January 2008, when he was disciplined for refusing to report to work. During the disciplinary proceedings for the latest incident, Hunter maintained that he was absent from work because he was sick, not because he was participating in a work stoppage. At the parole hearing, however, he stated that he did not report to work on the day in question because of threats that had been made and he wanted to avoid any type of violence. When asked whether he would make the same decision in the future, he said that he would avoid violence and not go to work.

While incarcerated Hunter has participated in various self-help programs, including Breaking Barriers, Men's Violence Prevention, Common Destiny Lifers, and Alcoholics and Narcotics Anonymous. In response to questions at the parole hearing, he demonstrated his familiarity with specific steps in the 12-step program and explained their application to his personal life. For years he has participated in fundraising for Narcotics Anonymous and Common Destiny. Working with the Prisoners Outreach Program, he helped with a project to provide nylon vests to children. He has taken courses in decision-making and problem solving, effective communication, and hazardous materials. Since 1994 he has actively participated in Islamic religious activities.

Hunter has earned a vocational certificate in bookbinding and has worked in the book bindery for 11,750 hours. He has completed the Machine Shop program, with specialties in both lathe and metal fabrication. He is also certified as a customer service specialist through the Electronics Technicians Association. Summarizing his work evaluations, including job assignments in janitorial work, metal fabrication, porter work, and his vocational programs, the Board stated that his supervisors "speak highly" of him.

If granted parole, Hunter plans to live with his brother in Vallejo. At the time of the hearing his brother lived with his wife and three children, ages 15, 13, and 11. If the Board does not approve of this arrangement, he has backup plans to live in San Francisco. He has been accepted in a Goodwill Industries vocational training program and hopes to work in metal fabrication or machine shop work.

Hunter's most recent psychological evaluation was completed in 2009. According to the report from that evaluation, Hunter has an "Axis I" diagnosis of cocaine dependence without physiological dependence in a controlled environment, alcohol abuse prior history, and adult antisocial behavior. He has no "Axis II" (or character) diagnosis, although the report noted a past failure to conform to social norms, impulsivity, recklessness, and disregard for the safety of others. Overall, his risk for violent recidivism in the free community was assessed as low. On each of the three scales used to assess the risk of future violence, Hunter scored in the low range. After reviewing Hunter's file and conducting a two-hour interview, the evaluating psychologist wrote: Hunter "displayed some insight into his former personality style, as well as the contributing factors to his drug dependence and to the instant offense. He has integrated parts of the 12-step program into his daily routine in a credible manner as means of preventing future difficulties with intoxicating substances in the community, he has been responsive to the treatment that has been available to him and remains positive about his progress and hopes for his future. Mr. Hunter communicated no attitudes or values that were pro-criminal in nature. Additionally, he has demonstrated a history of self-control, as indicated by very few Rules Violations Reports, or Custodial Counseling Chronos across his incarceration. All reports indicated that he is both emotionally and behaviorally stable."

The Board denied Hunter parole for seven years. In explaining its decision the Board first noted the heinous and callous commitment offense: the murder of a pregnant woman, the mother of a five year old, for a trivial reason and partying immediately thereafter. The Board noted Hunter's significant history of drug abuse, beginning at the age of 12 or 13 and continuing through the time he was incarcerated. The Board also based its denial on Hunter's "past and present mental state." It believed that in discussing his commitment offense Hunter minimized his conduct and was not credible. The Board noted that in discussing the crime, Hunter had not spontaneously discussed its effect on the fetus or on the five-year-old son of the victim, and thus, in the Board's view, failed to demonstrate appropriate remorse. The Board also noted Hunter's recent discipline for failing to report to work, terming it "significant misconduct." Finally, noting that Hunter murdered a pregnant woman who was also the mother of a five year old, the Board expressed concerns about his parole plans to reside with his brother, who has children in his home.

The Board's decision denying parole for seven years became final on February 10, 2010. Hunter's petition for a writ of habeas corpus in superior court was filed on January 11, 2011, and denied on March 15, 2011. The

instant petition was filed on April 1, 2011.[1] After requesting informal briefing, we issued an order to show cause. On December 21, 2011, we issued our initial decision concluding that the Board's denial was unsupported by any evidence and directing the Board to conduct a new parole hearing. On December 29, the California Supreme Court issued its opinion in *Shaputis II*, and the Attorney General promptly requested that we reconsider our decision in light of the intervening decision by the Supreme Court. We granted rehearing to accommodate the Attorney General's request. After careful study of the *Shaputis II* opinion and the supplemental briefing submitted by the parties, we remain convinced that under the deferential standard of review reaffirmed in *Shaputis II*, the Board's decision here fails to withstand scrutiny. The denial of parole is supported by no evidence and by no inference that can rationally be drawn from the evidence tending to show that Hunter will pose an unreasonable risk of future violence if granted release on parole.

## DISCUSSION

### I. *The Petition Is Timely.*

The Attorney General first argues that the petition is untimely. Capital habeas corpus petitions are untimely if not filed within 180 days of the final date for filing a petitioner's reply brief in the direct appeal. (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1221 [53 Cal.Rptr.3d 572].) The Attorney General asserts that this 180-day period serves as a benchmark for what should be deemed "substantial delay." Petitioner's superior court writ petition was not filed for more than 11 months after the Board's decision became final. The Attorney General contends the delay was substantial, unjustified, and does not fit into any exception to the habeas corpus timeliness requirement.

We do not agree that the considerations regarding the timeliness of a petition for habeas corpus challenging a criminal conviction apply to a petition challenging a parole denial. As pointed out in *In re Burdan* (2008) 169 Cal.App.4th 18, 31 [86 Cal.Rptr.3d 549], in the parole denial context the record is simply a paper record, typically well preserved, and the finality of the petitioner's conviction is not at issue. Therefore, delay normally can prejudice only the petitioner.[2] Because this is a parole denial case, it is not

---

[1] The petition alleges (1) the Board failed to cite evidence to support its conclusion of dangerousness; (2) the Board failed to demonstrate a nexus between the life crime and current risk of dangerousness; and (3) the application to Hunter of Proposition 9, as codified at Penal Code section 3041.5, subdivision (b)(3), violates federal and state ex post facto protections.

[2] It is possible in unusual circumstances for the passage of time, in combination with other events, to result in the petitioner forfeiting the habeas corpus remedy in a parole denial case. For example, if key records are lost during the elapsed time, writ review may become

subject to the deadlines associated with habeas corpus petitions challenging criminal convictions. There is no basis to deny this petition as untimely.

## II. There Is No Evidence Establishing a Rational Nexus Between Hunter's Life Crime and the Conclusion That He Will Present an Unreasonable Risk of Future Violence if Paroled.

We see no reason to restate the factors that the Board must consider in determining whether an inmate is suitable for parole or the principles that govern judicial review of the Board's decision. These matters have been stated and restated in numerous opinions of our Supreme Court and Courts of Appeal.[3] Most recently Shaputis II "reaffirm[ed] the deferential character of the 'some evidence' standard for reviewing parole suitability determinations." (Shaputis II, supra, 53 Cal.4th at p. 198.) The court reiterated the long-standing principle that "[w]hen reviewing a parole unsuitability determination by the Board or the Governor, a court must consider the whole record in the light most favorable to the determination before it, to determine whether it discloses some evidence—a modicum of evidence—supporting the determination that the inmate would pose a danger to the public if released on parole." (Id. at p. 214.) "[T]he proper articulation of the standard of review is whether there exists 'some evidence' demonstrating that an inmate poses a current threat to public safety . . ." (id. at p. 209), but "when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion . . . a court [may] overturn a contrary decision by the Board or the Governor" (id. at p. 211).[4]

---

impossible. If the petitioner has a subsequent parole hearing before the prior one is challenged, the challenge to the earlier denial may become moot. Here, no records have been lost and Hunter is not scheduled to have another parole hearing until 2016.

[3] E.g., In re Lawrence (2008) 44 Cal.4th 1181, 1201–1206 [82 Cal.Rptr.3d 169, 190 P.3d 535]; In re Shaputis (2008) 44 Cal.4th 1241, 1256–1258 [82 Cal.Rptr.3d 213, 190 P.3d 573] (Shaputis I); In re Prather (2010) 50 Cal.4th 238, 249–252 [112 Cal.Rptr.3d 291, 234 P.3d 541]; In re Roderick (2007) 154 Cal.App.4th 242, 261–264 [65 Cal.Rptr.3d 16].

[4] The majority opinion in Shaputis II summarized the relevant considerations in the judicial review of a parole suitability determination as follows: "1. The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety. [¶] 2. That question is posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior. [¶] 3. The inmate has a right to decline to participate in psychological evaluation and in the hearing itself. That decision may not be held against the inmate. Equally, however, it may not limit the Board or the Governor in their evaluation of all the evidence. [¶] 4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision. [¶] 5. The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a

The specific holding in *Shaputis II* was that adverse evidence from prior years concerning an inmate's suitability for parole does not "evaporate" because the inmate decides "to limit the evidence available to the Board by refusing to participate in an evaluation by a [Department of Corrections and Rehabilitation] psychologist and declining to speak to the Board on any matter of substance at his parole hearing." (*Shaputis II, supra,* 53 Cal.4th at p. 211.) The court acknowledged "that often the most recent evidence as to the inmate's level of insight will be particularly probative on the question of the inmate's present dangerousness, but that is not *necessarily* the case. If the newest evidence is unreliable or insubstantial, the parole authority is not bound to accept it." (*Ibid.*) As the court itself expressed it, *Shaputis II* "is an example of the Board's proper reliance on older evidence in the record, and of the disadvantages that may follow from an inmate's decision not to testify at a parole hearing or otherwise cooperate in the development of current information regarding his or her mental state." (*Id.* at p. 220.)

The unusual factual situation with which the court was concerned in *Shaputis II* has no application in the present case. The issue here is not whether prior evidence of unsuitability trumps current indicators of suitability, but simply whether there is any evidence that provides a rational basis for considering Hunter to pose an unreasonable risk of reoffending if granted parole.

█ We do not quarrel with the Board's assessment that Hunter's commitment offense was egregious and callous. But however horrible the crime, it is an insufficient basis for the denial of parole unless there is an evidence-based, rational nexus between the offense and present behavior. (*In re Lawrence, supra,* 44 Cal.4th at pp. 1210, 1227; *In re Ryner* (2011) 196 Cal.App.4th 533, 546 [126 Cal.Rptr.3d 380] [commission of a heinous crime is insufficient to deny parole unless factors demonstrating unsuitability, supported by some evidence, are probative of a nexus between the gravity of the offense and a present risk to public safety].) Hunter's crime was committed in 1984, 25 years before the Board hearing. It was motivated by a desire to obtain drugs and committed while Hunter's judgment was impaired by drugs. There is no evidence that petitioner has used or sought drugs while imprisoned, or that he is likely to return to their use upon release. To the contrary, he has successfully participated in substance abuse programs and has been evaluated to be at low risk of returning to his former addiction. The Board expressed no doubts in this regard.

The Board's denial rests primarily upon its conclusion that Hunter lacks remorse and insight, based on its belief that Hunter's explanation of his crime

---

rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Shaputis II, supra,* 53 Cal.4th at pp. 220–221.)

lacks credibility. The Board did not believe that after having consensual sex with the victim and leaving to buy food, Hunter returned with a knife to scare the victim rather than to kill her. It questioned why he would arm himself to return to the victim's house when he knew she was alone and eight months pregnant. It questioned why the victim, who had a boyfriend, would want to have sex with Hunter. It noted that Hunter had pled guilty to first degree murder, implying premeditation.

■ In *Shaputis II*, the Supreme Court confirmed that "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations" (*Shaputis II, supra*, 53 Cal.4th at p. 218), but pointed out that "lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness" (*id.* at p. 219). (See, e.g., *In re McDonald* (2010) 189 Cal.App.4th 1008, 1023 [118 Cal.Rptr.3d 145] [lack of insight is a proper consideration for determining suitability for parole, but conclusion that there is a lack of insight must be based on evidence in the record upon which the finder of fact is entitled to rely]; *In re Powell* (2010) 188 Cal.App.4th 1530, 1542 [116 Cal.Rptr.3d 432] [lack of insight is probative of unsuitability only if rationally indicative of current dangerousness].)

■ Whatever inferences might properly be drawn were there some evidence that Hunter was being untruthful in stating that he returned with the knife only to scare the victim, we have reviewed the entire central file (or C-File) that was available to the Board at the hearing and found no evidence that contradicts Hunter's version of the crime. His version of events has remained unchanged over numerous retellings. If his version of the crime is "not physically impossible and [does] not strain credulity such that his denial of an intentional killing [is] delusional, dishonest, or irrational," the Board cannot discredit his account of events. (*In re Palermo* (2009) 171 Cal.App.4th 1096, 1112 [90 Cal.Rptr.3d 101], disapproved on another ground in *In re Prather, supra*, 50 Cal.4th at p. 252; see *In re Jackson* (2011) 193 Cal.App.4th 1376, 1388–1391 [123 Cal.Rptr.3d 486]; *In re McDonald, supra*, 189 Cal.App.4th at p. 1018.) As in *Palermo, McDonald* and *Jackson*, "this is not a case where the inmate's version of the crime was physically impossible or strained credulity." (*In re Jackson, supra*, at p. 1391.) While there is evidence of the inmate's guilt of the crime charged, the denial of the prosecutor's version "is not necessarily inconsistent with the evidence. Further, like the inmates in [these three cases, Hunter] accepted responsibility for the death of his victim, behaved well in prison, successfully engaged in self-improvement activity while there, and received positive reports regarding his potential dangerousness by prison psychologists. Under these circumstances, [Hunter's] continuing insistence [on his version of the crime] does not support the Board's

finding that he remains a danger to public safety." (*Ibid.*) The decision in *In re Jackson* was cited with approval in *Shaputis II, supra,* 53 Cal.4th at page 216.

The circumstances here are very different from those in cases upholding the conclusion that an inmate lacks insight based on discrepancies between his account of the crime and the record. In the two *Shaputis* cases, for example, the Supreme Court upheld the determination of the Governor in the first case, and of the Board in the second, that the petitioner remained a threat to public safety based in part on disbelief of the petitioner's claim that the victim's death had been accidental. The conclusion that Shaputis was not credible was based on the inmate's extensive prior history of spousal abuse (44 Cal.4th at pp. 1246–1247 [53 Cal.4th at p. 227]) and evidence that the gun used in the murder could not have been fired accidentally (44 Cal.4th at pp. 1248, 1260 [53 Cal.4th at pp. 207–208]). (See *In re Taplett* (2010) 188 Cal.App.4th 440, 450 [115 Cal.Rptr.3d 565] [upholding parole denial where there was specific evidence that petitioner's version of events was inaccurate]; *In re Smith* (2009) 171 Cal.App.4th 1631, 1639 [90 Cal.Rptr.3d 400] [same].)

The Board's view that Hunter formed an intent to murder the victim when he retrieved the knife from his car apparently was based in part on the fact that Hunter pled guilty to first degree murder. When the deputy commissioner confronted Hunter about what he perceived as Hunter's disingenuous account of the crime, the commissioner commented, "You've already copped to murder one." But at the hearing on Hunter's change of plea, the prosecutor discussed culpability under the felony-murder doctrine, so that by his plea Hunter apparently acknowledged his guilt under that theory.

Thus, we do not reweigh the significance of evidence considered by the Board, but simply find no evidence in the record that supports the Board's conclusion. The record contains no evidence that Hunter's consistent description of his crime is untruthful and his insistence that he did not intend to kill Tanya when he returned to the home with the knife provides no basis for the inference that he lacks remorse or insight. It certainly provides no basis for believing, contrary to all of the positive evidence in the record, that Hunter will pose an unreasonable risk of future harm if granted parole.

■ Nor is there any other evidence in the record that Hunter lacks genuine remorse for having killed Tanya and the fetus she was carrying. Both before and during the parole hearing Hunter has expressed remorse for his

actions.[5] The Board questioned the genuineness of these expressions based in part on its unfounded perception that Hunter minimized his culpability. Although Hunter claimed in his narrative that at certain points in the struggle he was prepared to desist and defended himself to counter the victim's actions, he unequivocally described how he initiated the violence, motivated by a desire to obtain drugs. He emphasized that he had a "serious and heavy addiction" and was hoping to buy cocaine from his dealer. He brought the knife with him on his return to the apartment to scare Tanya to provide him with the drugs and he began the struggle when she refused to do so. Hunter described an evolving situation in which his desire to frighten Tanya led to her murder. A review of his full narrative shows that he consistently admitted he was the aggressor, motivated by a desire to obtain drugs. (See *In re Powell, supra,* 188 Cal.App.4th at p. 1540 [petitioner's description of isolated interaction with victim as accidental does not negate petitioner's acceptance of responsibility for entire incident, including murder].)

The Attorney General focuses on the fact that Hunter referred to "tapping" petitioner with the knife. At one point Hunter also described having "scratched" the victim. But Hunter also spoke of inflicting a "puncture wound" and when asked how the victim died, he replied "[b]y stab wounds." When asked how many times he stabbed her, he replied, "I would say, I know in her chest. I'm not for sure if I hit her twice in her chest, but I know I hit her definitely once on her side that I remember." The district attorney asked whether he might have stabbed her as many as seven times and he readily acknowledged that possibility. In context, Hunter's references to "tapping" and "scratching" the victim cannot be understood as attempts to minimize his responsibility.

The Board also referred to Hunter's failure to spontaneously include in his narration of events mention of Tanya's five-year-old son or the fetus. But the Board asked him if the victim had been pregnant, and Hunter replied that she had been. The Board then asked why he had not mentioned that fact and Hunter replied that he had not yet had a chance, but that he was going to get to that. He went on to state that his addiction was so compelling that he had "no regard[] for her life or her unborn child." When asked to name the victims of the crime, he included Tanya's parents and extended family, but did not mention her five-year-old son. But once the Board asked about the son and the fetus, Hunter immediately agreed that they too were victims. He apologized for not bringing up the five year old and indicated that he could only imagine how the child experienced the crime. Later in the hearing he twice mentioned the unborn child as a victim. At no point during the hearing did he say anything to minimize the impact of his conduct on the fetus or on

---

[5] The manifestation of "[s]igns of [r]emorse" is a factor tending to show suitability for parole. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(3).)

the five-year-old child. In light of Hunter's numerous statements of remorse and acceptance of responsibility and his nondefensiveness when the omissions were pointed out, the temporary oversight hardly indicates a failure to appreciate the harm that he caused or to accept responsibility for his actions.[6]

"Evidence of lack of insight is indicative of a current dangerousness only if it shows a *material* deficiency in an inmate's understanding and acceptance of responsibility for the crime. To put it another way, the finding that an inmate lacks insight must be based on a factually identifiable deficiency in perception and understanding, a deficiency that involves an aspect of the criminal conduct or its causes that are significant, and the deficiency by itself or together with the commitment offense has some rational tendency to show that the inmate currently poses an unreasonable risk of danger." (*In re Ryner, supra*, 196 Cal.App.4th at pp. 548–549, fn. omitted.) Here, Hunter's passing failure to refer to the fetus or five-year-old son demonstrates no deficit in perception or understanding; nor does it rationally demonstrate current dangerousness.

Furthermore, the omissions are not evidence that Hunter's parole plans to live with a relative who has children are inappropriate, as the Board suggested. In light of Hunter's abstention from alcohol and drug use for the last quarter-century, his participation in and commitment to substance abuse programs, and his generally positive record in the intervening years, the fact that in 1984, while under the influence of drugs, he killed the fetus in the course of killing the mother, and created a traumatic and tragic situation for Tanya's young son, says nothing about the risk he would pose if he were now to live in a house with children. (Cf. *In re Jackson, supra*, 193 Cal.App.4th at pp. 1380, 1386 [fact that defendant was convicted of murdering his former girlfriend did not make his parole plans, which included plan to live with family or friends, unrealistic]; *In re Dannenberg* (2009) 173 Cal.App.4th 237, 242–243, 245 [92 Cal.Rptr.3d 647] [fact that inmate who had drowned his wife maintained solid relationships with his family and planned to live with longtime friends did not render his parole plans unrealistic]; *In re Criscione* (2009) 173 Cal.App.4th 60, 75–76 [92 Cal.Rptr.3d 258].)

■ Finally, in the course of explaining over some 10 pages the Board's reasons for finding Hunter unsuitable for parole, the presiding commissioner made brief reference to the fact that in January 2008 Hunter had been

---

[6] Indeed, Hunter prefaced his account to the Board by stating that he was "giving more of an overview of it" and concluded by inviting questions, stating, "Anything else that I can elaborate on as far as that I maybe left out, because I basically gave an overview of it." Hunter's initial account of the murder mentioned the presence of the sleeping child in the next room, and he incorporated the unborn child in his list of victims after the Board pointed out the omission.

disciplined for failing to report to work. Recent discipline may provide a basis for denying parole. (See, e.g., *In re Hare* (2010) 189 Cal.App.4th 1278 [118 Cal.Rptr.3d 1] [discipline for possession of an altered toothbrush considered to have been modified for use as a weapon]; *In re Reed* (2009) 171 Cal.App.4th 1071, 1085 [90 Cal.Rptr.3d 303] [recent misconduct violated specific directive from the Board given only two months before and "was not an isolated incident; instead, it was part of an extensive history of institutional misconduct, including 11 CDC 115's and 19 CDC 128-A's"].) But prison discipline, like any other parole unsuitability factor, "supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Shaputis II, supra*, 53 Cal.4th at p. 219.) Not every breach of prison rules provides rational support for a finding of unsuitability. (See, e.g., *In re Palermo, supra*, 171 Cal.App.4th at p. 1110 ["Nothing in the record supports a conclusion that [inmate] poses a threat to public safety because he once engaged in the unauthorized use of a copy machine, once participated in a work strike, and once was found in possession of a fan stolen by his roommate."].)

Hunter failed to report to work on one occasion.[7] Although at the disciplinary hearing Hunter claimed that he did not report to work because he was ill, he later acknowledged that the true reason was his desire to avoid exposure to violence in light of threats that had been made in connection with an inmate work stoppage. Hunter told the Board, "I don't want any type of violent situation on my records at all. I try to avoid conflict by all means," to which a commissioner responded, "Well, *that's something we obviously want you to do.*" Moments later the commissioner added, "Well, let me point out the positives: That there's been no violence on your part and no weapons, and I want to point that out." Elsewhere, the Board also noted that Hunter's supervisors speak highly of him. One supervisor described him as being a model for other inmates, displaying a "good attitude and work ethic."

Thus, Hunter's failure to have reported to work on this single occasion does not indicate that he is likely to pose a danger if paroled. There simply is no nexus between this particular disciplinary incident and the likelihood that Hunter will engage in future violence if released from prison. The incident provides no basis for upholding the finding of unsuitability. (*Shaputis II, supra*, 53 Cal.4th at p. 219; *In re Palermo, supra*, 171 Cal.App.4th at p. 1110.)

---

[7] In 1987 Hunter was disciplined twice for disobeying orders. Since then—for 21 years as a commissioner observed—Hunter had been discipline free prior to the one incident in January 2008.

CONCLUSION

As summarized in *In re Lawrence, supra*, 44 Cal.4th at page 1202 and repeated in *In re Prather, supra*, 50 Cal.4th at page 249, " 'Pursuant to statute, the Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public* . . . ." ([Pen. Code,] § 3041, subd. (a), italics added.)' " Release on parole is thus "the rule, rather than the exception." (*In re Smith* (2003) 114 Cal.App.4th 343, 351 [7 Cal.Rptr.3d 655].) A parole release date must be set unless the Board determines that public safety requires a lengthier period of incarceration. (*In re Lawrence, supra*, 44 Cal.4th at p. 1202; § 3041, subd. (b).) The Board is to consider all relevant information, but the principal consideration is public safety. (*In re Lawrence, supra*, at pp. 1205, 1210.) The denial of parole may be affirmed only if supported by "some evidence" that public safety requires further incarceration. (*Id.* at p. 1191.) "[T]he circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public." (*Id.* at p. 1212; see, e.g., *In re Moses* (2010) 182 Cal.App.4th 1279, 1300 [106 Cal.Rptr.3d 608] [parole shall normally be granted unless some evidence of current dangerousness, after consideration of all circumstances, justifies denial]; *In re Burdan, supra*, 169 Cal.App.4th at p. 29 [court must consider whether at least one factor relied on to deny parole is predictive of current dangerousness].) Nothing in the most recent decision in *Shaputis II* changes any of these principles.

The Board has not articulated a rational basis supported by "some evidence" to support its conclusion that Hunter will pose an unreasonable risk to public safety if paroled. There is no evidence that his mental state (including his remorse, acceptance of responsibility, or insight) indicates current dangerousness. There is no evidence that his narrative of the life crime is inaccurate or minimizes the significance, impact, or wrongfulness of his prior actions. Nothing in the record links his life crime, committed in 1984, with an assessment that he will pose an unreasonable danger if now granted parole. Nor has the Board articulated or do we see a rational nexus between the 2008 disciplinary event and a risk of future violence. In short, the record fails to provide any rational basis for finding Hunter unsuitable for parole.[8]

---

[8] Because of the conclusion we have reached, we need not consider Hunter's additional contention that the denial of a further hearing for seven years violates the ex post facto clauses of the state and federal Constitutions.

## DISPOSITION

The matter is remanded to the Board to promptly conduct a subsequent parole hearing in light of this opinion.

McGuiness, P. J., and Jenkins, J., concurred.