Filed 6/3/15  In re Carrillo CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re CARRILLO, | B259811 |
| On Habeas Corpus. | (Los Angeles County Super. Ct. No. BH009479) |

ORIGINAL PROCEEDING for Petition for Writ of Habeas Corpus, BH009479, William C. Ryan, Judge.  Petition denied.

Michael Evan Beckman, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Senior Assistant Attorney, Julie A. Malone and Jennifer O. Cano, Deputy Attorneys General, for Respondent.

—————————————

In 1997, petitioner Pedro Carrillo was convicted of two counts of second degree murder and sentenced to concurrent terms of 16 years to life in state prison. On July 9, 2013, the Board of Parole Hearings (Board) found Carrillo suitable for parole and set a release date. The Governor then reversed the Board's decision, concluding that Carrillo's release from prison would pose an unreasonable risk of danger to society. In reaching his decision, the Governor relied, in part, on confidential information in Carrillo's prison file, which was not disclosed to Carrillo or his counsel. Carrillo filed a petition for writ of habeas corpus in Los Angeles County Superior Court, challenging the Governor's decision on the grounds that the reliance on undisclosed confidential information violated Carrillo's constitutional right to due process, and the reversal of the Board's grant of parole was not supported by some evidence that Carrillo poses a current risk to public safety. Following the superior court's denial of his petition, Carrillo filed a petition for writ of habeas corpus in this court. For the reasons set forth below, we deny the petition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Commitment Offense

In 1996, Carrillo, then 18 years old, was an active member of the Florencia gang. The Florencia gang was involved in an ongoing feud with the 38th Street gang. On November 23, 1996, three Florencia gang members were shot in Florencia territory. Three days later, Carrillo drove his mother's car into 38th Street territory, accompanied by a fellow Florencia gang member who was armed with a semi-automatic gun. Carrillo stopped the car in front of two 38th Street gang members, Juan Ortiz and Carlos Vargas, who were painting gang graffiti on a wall. Carrillo's passenger then opened fire on Ortiz and Vargas, killing them both. Ortiz, who was in a wheelchair, was shot twice, and Vargas was shot five times. Carrillo drove the car away and dropped off his passenger as they were being pursued by the police. Carrillo was apprehended a short time later. In an interview with the police, Carrillo said that he did not know his passenger was armed or had planned to shoot anyone. Carrillo identified his passenger as Shaggy, but told the police he was unaware of Shaggy's true name or where he went after the shooting.

2

A jury convicted Carrillo of two counts of second degree murder (Pen. Code, § 187), and as to each count, found true the enhancement allegation that a principal was armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). On July 16, 1997, Carrillo was sentenced to concurrent terms of 16 years to life in state prison. He became eligible for release on parole on March 20, 2011.

## II. Carrillo's Conduct During Incarceration

### A. Disciplinary Record

During his 17 years of incarceration, Carrillo has received a total of four CDC-Form 115 rules violation reports and one CDC-Form 128A counseling report. His last reported incident of misconduct was in November 2001 and involved his participation in a prison riot. In 2007, while housed at Centinela State Prison, Carrillo was investigated by the Institutional Gang Investigation (IGI) unit for his possible involvement in prison gang activity. He was placed in the prison's administrative segregation unit during the investigation. In a July 3, 2007 non-confidential memo, the IGI unit reported that it "was unable to complete the investigation/validation at this time" and recommended that Carrillo be released from the administrative segregation unit and his activity be monitored. Carrillo was thereafter placed back in the general prison population without being charged with any disciplinary violation in connection with the investigation. At the time of his 2013 parole hearing, Carrillo had been discipline-free for over 12 years.

### B. Rehabilitation Efforts

Carrillo has made significant efforts to rehabilitate himself in prison through his participation in educational, vocational, and self-help programs. He completed a GED in 2005, a vocational program in mill and cabinet work in 2009, and a vocational program in plumbing in 2010. He has participated in numerous therapeutic and self-help programs, including peer counseling, anger management, alternatives to violence, creative conflict resolution, and life skills training. He has been active in both Narcotics Anonymous and Alcoholics Anonymous since 2009, and has volunteered his time to a youth prevention program counseling at-risk youth since 2012. Carrillo converted to

3

Christianity in 2011, and has remained involved in religious-based programs and services.

### C. Psychological Evaluations

In 2009, Dr. Jana Larmer submitted a psychological evaluation of Carrillo to the Board. Dr. Larmer concluded that Carrillo "presents a relatively low risk for violence in the free community." Dr. Larmer noted that, while Carrillo "does have several historical factors which are related to risk of violent recidivism, [he] had none of the current risk factors . . . and he has worked to develop a plan for his future that will reduce his risk." In 2012, Dr. James McNairn completed a supplemental psychological evaluation of Carrillo, and concluded that the "diagnosis and violence risk ratings received in the 2009 psychological evaluation remain valid, without significant aggravation or mitigation."

### D. Parole Plans

As of January 2013, Carrillo had been accepted into three transitional housing facilities and planned to reside in the Francisco Home in Los Angeles for six to 12 months upon being released on parole. He then planned to move to his cousin's home in San Diego and to work for his cousin's pest-control business. While incarcerated, Carrillo has maintained contact with a number of family members, many of whom submitted letters of support and expressed their willingness to offer Carrillo employment, housing, or other assistance upon his release from prison.

## III. The Board's Parole Suitability Decision

### A. February 27, 2013 Hearing

On February 27, 2013, the Board held a parole suitability hearing for Carrillo. During the hearing, the panel asked Carrillo about his participation in a 2011 statewide prison hunger strike. The strike was initiated by the Mexican Mafia (EME) prison gang at the Pelican Bay State Prison's security housing unit (SHU). Carrillo admitted that he participated in one hunger strike, but stated that he did so because of concerns about his safety. Carrillo told the panel, "I did not participate in this hunger strike because I share

4

in their ideas or I believe in their ideas as you know. It wasn't because I wanted to feel accepted by them or anything like that. It was for my safety, sir. It was mostly for my safety."

The panel also asked Carrillo about his alleged involvement in prison gang activity based on certain confidential information contained in his central prison file. Carrillo's counsel objected to the use of any confidential information at the parole hearing, noting that neither he nor Carrillo had been provided with a summary of the information or a redacted version of it. His counsel further argued that the use of confidential information violated Carrillo's protected liberty interest in parole as well as his constitutional rights to due process and to confront witnesses against him. The panel overruled these objections, reasoning that under the applicable state regulations, Carrillo was not entitled to access confidential information in his central file, nor was the Board empowered to disclose any such confidential information to him.

The panel specifically asked Carrillo about any association he may have had with the Mexican Mafia prison gang. In response to the panel's questions, Carrillo denied that he had ever communicated with any members of the Mexican Mafia or performed any functions, tasks, or work on behalf of the gang during his time in prison. He repeatedly denied that he had ever exchanged any written correspondence with a Mexican Mafia member or associate, and further denied ever receiving or transmitting any funds or other items of value for the gang. Carrillo noted that he was placed in administrative segregation in 2007 while under investigation for being a "shot caller on the yard," but was later returned to the general population without being disciplined or validated as a prison gang member or associate. The panel reiterated that it was not asking Carrillo whether he was a member or associate of the Mexican Mafia, but rather was asking him, "Did you ever send anything to any member or associate, or anyone that was involved in the [Mexican] Mafia?" Carrillo again replied, "No, sir."

In his closing argument, Carrillo's counsel noted that he could not properly respond to the confidential information in his client's central file without knowing the contents. He stated, "We think we know that there are people in prison who are claiming

5

that my client was active in EME. What I can say is that he's never been validated as a prison gang member. He has never been written up for gang activity in prison. He's never even received a counseling chrono for it. Knowing how seriously CDCR takes gang members, if there was any fire from this smoke, my client wouldn't be sitting in 2011 helping a hunger strike that started at the SHU in Pelican Bay, he'd be at the SHU in Pelican Bay." Carrillo's counsel also repeated his prior objections to the use of confidential information at a parole hearing "without giving the attorney or the inmate any opportunity to rebut or deal with it."

After deliberating on the matter, the panel decided to continue Carrillo's parole hearing to a later date so that it could request an investigation of certain confidential information in his file. The panel members noted that the "reliability of information contained within the Central File and [Carrillo's] own credibility are the crux of the matter here," and that they were "less concerned about the mechanics of the commitment offense than [they were] about the potential for a nexus between [Carrillo's] credibility at this time and current dangerousness." The panel further explained to Carrillo that "[t]here is information contained within your Central File which would be relevant if corroborated," and "will either support or refute significant statements which you have made during today's hearing." The panel indicated that it would request that the Board's Investigations Unit conduct a limited investigation of the confidential information in Carrillo's file, and would reschedule the parole hearing once the investigation was complete.

### B.     July 9, 2013 Hearing

On July 9, 2013, the Board resumed the parole suitability hearing. The panel noted that it had again reviewed the confidential portion of Carrillo's central file, and also had reviewed a confidential investigative report dated May 23, 2013, prepared by the Board's Investigations Unit at the panel's request. The panel explained that one of its concerns at the prior hearing was the extent to which Carrillo may have participated in or acted on behalf of a prison gang. The panel again asked Carrillo if he performed any

6

work, task, or function in furtherance of the objectives of the Mexican Mafia at any time since 2001. Carrillo denied performing any such activity. He testified that other inmates might have assumed he was still a part of a street gang in the past, but once he became a Christian in 2011, the inmates would regard him as a non-active gang member. Carrillo further testified that he was never a member of the Mexican Mafia prison gang, and that he no longer considered himself to be a member of the Florencia street gang.

Following the hearing, the Board concluded that Carrillo was suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. While acknowledging that the crime committed by Carrillo was "disturbing" in nature, the panel found that many of the factors supporting suitability were present in this case. Among those factors, Carrillo had shown "remorse for his involvement in [the] murders," and had "accepted responsibility for his involvement." He was "a very young man at the time of the commitment offense," and had demonstrated significant maturation during his time in prison, including an "ability to distance himself from negative peer influences [and] gang activity." Carrillo had "been discipline-free for over 12 years," and had "engaged in institutional behavior which does suggest an enhanced ability to function within the law upon his release." In addition, he had presented "realistic plans for parole," had "developed marketable skills," and had "long term pro-social support from individuals outside [prison] including family members." With respect to the confidential information in Carrillo's central file, the panel simply noted that the "[c]oncerns which this panel had regarding information contained within these documents have, in our judgment, been addressed by the investigation which was completed at our request."

## IV.    The Governor's Reversal of the Board's Decision

On October 31, 2013, Governor Edmund G. Brown Jr. issued a letter reversing the Board's decision. The Governor acknowledged that Carrillo had made efforts to improve himself while incarcerated, including earning a GED, completing vocational training, and participating in various self-help programs. While commending Carrillo taking for these

positive steps, the Governor found that they were outweighed by the negative factors demonstrating that Carrillo remained unsuitable for parole.

The Governor specifically found that the murder committed by Carrillo "was senseless and callous" in that Carrillo and a fellow gang member "drove into rival gang territory and shot at a group of people who posed no threat to them as an act of cold retribution." The Governor also found that there was "confidential information in Mr. Carrillo's prison file that indicates he has been active in the Mexican Mafia gang." As set forth by the Governor, "Mr. Carrillo adamantly told the Board that he had never been an active member of the Mexican Mafia, had never communicated with any member, had never performed any functions, tasks, or work for the gang, and had never written to or received letters from any member of the Mexican Mafia. Although gang investigators have not validated Mr. Carrillo as a member of the gang, numerous sources have reported that Mr. Carrillo was not only a member of the Mexican Mafia, but fairly recently in a leadership position for the gang at one prison. Prison officials have deemed these sources of information credible and reliable. His denial of any contact or involvement with the Mexican Mafia, given the extent of the confidential information to the contrary, is not credible. Furthermore, Mr. Carrillo participated in a hunger strike organized and directed by prison gangs in 2011. His gang activity and failure to be forthcoming about it show that he is not yet committed to turning away from gangs and his violent lifestyle, and therefore remains a risk to society."

## V.     Carrillo's Petition for Writ of Habeas Corpus

On February 14, 2014, Carrillo filed a petition for writ of habeas corpus in Los Angeles County Superior Court. Carrillo sought to challenge the Governor's decision on the grounds that the Governor violated Carrillo's federal and state constitutional rights by (1) arbitrarily and capriciously denying him parole, (2) improperly relying on confidential information withheld from Carrillo and his attorney, and (3) erroneously basing his decision on Carrillo's alleged association with the Mexican Mafia even though such association was not a convicted offense under Penal Code section 3041, subdivision (b).

8

The superior court independently reviewed the record, including conducting an in camera review of confidential information from Carrillo's central file, which had been submitted under seal by the Attorney General. The court concluded that the record contained some evidence supporting the Governor's determination that Carrillo currently posed an unreasonable risk of danger to society and was therefore not suitable for release on parole. The court also concluded that the Governor's use of confidential information in reaching his decision did not impermissibly infringe on Carrillo's due process rights. Finally, the court concluded that the Governor's consideration of Carrillo's prison gang activity did not violate any of Carrillo's constitutional rights because the Governor was entitled to rely on information bearing on Carrillo's suitability for parole even if that conduct did not result in a conviction. The superior court accordingly denied the petition.

On November 3, 2014, Carrillo filed a petition for writ of habeas corpus in this court. We issued an order to show cause and ordered the filing of a written return and traverse. We also granted the Attorney General's request to file certain confidential documents under seal in support of the return. The sealed record consists of eight confidential memoranda from Carrillo's central file, which were relied upon by the Governor in reversing the Board's decision to grant Carrillo parole.

## DISCUSSION

### I.    Legal Principles Governing Parole Suitability Decisions

"'[T]he Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. [Citations.] The Board's parole decisions are governed by [Penal Code] section 3041 and title 15, section [2402] of the California Code of Regulations. . . .'" (*In re Shaputis* (2008) 44 Cal.4th 1241, 1256 (*Shaputis I*).) Penal Code section 3041 provides that the Board "shall set a release date unless it determines that the gravity of the current convicted offense . . . , or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed. . . ." (Pen. Code, § 3041, subd. (b).)

9

Title 15, section 2402 of the regulations sets forth the factors to be considered by the Board in determining whether an inmate is suitable for parole. Factors tending to indicate suitability include (1) absence of a juvenile record, (2) stable social history, (3) signs of remorse, (4) significant life stress motivated the crime, (5) battered woman syndrome, (6) no significant history of violent crime, (7) inmate's age, (8) realistic plans for the future, and (9) institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Factors tending to show unsuitability include (1) commitment offense was committed "in an especially heinous, atrocious or cruel manner,"[1] (2) previous record of violence, (3) unstable social history, (4) sadistic sexual offenses, (5) psychological factors, and (6) serious misconduct while incarcerated. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

In exercising its discretion, the Board "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1219.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Id.* at p. 1212.) While the Board can rely on the aggravated circumstances of the commitment offense in finding an inmate unsuitable for parole, "the aggravated nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his … current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his … commission of

---

[1]    The regulation specifies that the factors to be considered in determining whether the offense was committed in an especially heinous, atrocious or cruel manner are:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).).

the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Id*. at p. 1214.)

Once the Board sets a parole date, the California Constitution empowers the Governor to review the parole decision of an inmate who has been convicted of murder and sentenced to an indeterminate prison term. (Cal. Const., art. V, § 8, subd. (b).) The Governor's decision to affirm, modify or reverse the decision of the Board rests on the same factors that guide the Board's decision (Cal. Const., art. V, § 8, subd. (b)), and must be based on "materials provided by the parole authority." (Pen. Code, § 3041.2, subd. (a).) "Although 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' [citation], the Governor undertakes an independent, de novo review of the inmate's suitability for parole. [Citation.] Accordingly, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety. [Citation.]" (*Shaputis I*, *supra*, 44 Cal.4th at p. 1258.)

## II. Standard of Review

"[W]hen a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1212.) "It is settled that under the 'some evidence' standard, '[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of [the Board or] the Governor. … [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of [the Board or] the Governor… . As long as the … decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the … decision.' [Citations.]" (*In re Shaputis* (2011) 53 Cal.4th 192, 210

11

(*Shaputis II*).)  Moreover, "[w]hile the evidence supporting a parole unsuitability finding must be probative of the inmate's current dangerousness, it is not for the reviewing court to decide which evidence in the record is convincing.  [Citation.]  Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by the Board or the Governor."  (*Id*. at p. 211.)

### III.   The Governor's Use of Confidential Information In Reviewing the Board's Grant of Parole Did Not Violate Carrillo's Constitutional Rights

Carrillo contends that the Governor's reliance on confidential information in his prison file in reversing the Board's parole decision violated his fundamental rights to due process and to confront witnesses against him as guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, and their counterparts in the California Constitution.  Carrillo further claims that, under relevant California case law, neither the Board nor the Governor could consider confidential information in Carrillo's prison file in determining his suitability for parole unless Carrillo and his counsel were first given access to such information and afforded an opportunity to defend against it.

In support of this position, Carrillo relies on *In re Prewitt* (1972) 8 Cal.3d 470 (*Prewitt*).  In *Prewitt*, the California Supreme Court considered whether an inmate whose unexecuted grant of parole had been rescinded was entitled to disclosure of confidential information relied on by the parole authority in making the rescission decision.  The Court held that, at a parole rescission or revocation proceeding, an inmate had a due process right to be provided with copies of confidential documents submitted to the parole authority unless the disclosure of such information would expose the informant to "an undue risk of harm."  (*Id*. at p. 476.)  The Court made clear that its holding was limited to parole rescission and revocation proceedings, and expressly declined to address whether the same procedural rights were "applicable to proceedings by the [parole authority] for fixing the terms of and granting paroles to prison inmates."  (*Id*. at p. 475.)  The Court nevertheless cautioned that "certain proceedings in connection with the fixing of terms and granting of paroles may not now conform to due process requirements."

(*Ibid*.)  The Court further stated that "[w]hen determining whether a procedure involved in the term-fixing or parole-granting process violates due process, 'the reviewing court must consider the objectives sought to be achieved by the challenged procedure, the possible unfairness to the prisoner, and the availability of alternative procedures which are less burdensome to the prisoner.'  [Citation.]"  (*Ibid*.)

In two subsequent cases—*In re Olson* (1974) 37 Cal.App.3d 783 (*Olson*) and *In re Ochoa* (2011) 199 Cal.App.4th 1274 (*Ochoa*)—the California Court of Appeal applied the reasoning in *Prewitt* to determine how confidential information should be handled in proceedings for granting parole to prison inmates.  In *Olson*, two inmates filed a petition for writ of habeas corpus in the superior court, seeking inspection of their prison files to determine whether the parole authority abused its discretion in denying them parole. (*Olson*, *supra*, at pp. 784-785.)  The parties agreed that the parole authority had the right to withhold confidential documents that could create a danger to inmate or institutional security if disclosed, but disagreed which party had the burden of proof.  The court of appeal recognized that, under the rationale of *Prewitt*, an inmate had "a due process right to see the documents in the [parole authority's] possession." (*Id*. at p. 790.)  The court also recognized that the state had a valid interest "to keep confidential such records in an inmate's file which will create a danger to the security of individuals or the institution." (*Id*. at p. 788.)  Applying the procedural considerations in *Prewitt* to strike a balance between "the state's interest in maintaining confidentiality" and "the inmate's interest in obtaining liberty," the court concluded the burden was on the state "to show that it is necessary to maintain the confidentiality of a document, rather than on an inmate to prove its relevancy and need in a habeas corpus proceeding." (*Id*. at pp. 789-790.)

In *Olson*, the court of appeal also proposed procedures for determining the scope of information to be disclosed to an inmate during the parole-granting process.  The court stated:  "Since the Department [of Corrections] and its component agencies are under the obligation, in the first instance, to disclose to an inmate or his attorney all documents in the files pertaining to him upon request, such documents shall be made available to the inmate or his attorney upon receipt of such request.  If, in the judgment of the

13

Department, the security of the institution will be jeopardized or an informant will be exposed to an undue risk of harm by the disclosure of a particular document, the Department may refuse to make available to the inmate or his attorney any document deemed to have such potentiality provided, that in conjunction with the refusal, the Department make known to the inmate or his attorney the general nature of the document withheld and the reason for nondisclosure. If the inmate disagrees with the Department's justification for withholding the document from his perusal, or the propriety of the Department's determination, review thereof can be had through a habeas corpus petition filed by the inmate. Upon the presentation of such petition to the court, and upon its request, the document in question shall be forwarded to the court for its private perusal for the sole purpose of determining whether it is clothed with the indicia of confidentiality justifying nondisclosure." (*Olson*, *supra*, 37 Cal.App.3d at pp. 790-791.)

In *Ochoa*, the court of appeal adopted a similar procedure for determining the extent to which an inmate in a parole suitability proceeding was entitled to disclosure of confidential information in his or her prison file. (*Ochoa*, *supra*, 199 Cal.App.4th at p. 1283.) The inmate in *Ochoa* filed a petition for writ of habeas corpus in the superior court, challenging the Governor's reversal of the Board's grant of parole. The Governor's decision was based, in part, on undisclosed confidential information in the inmate's prison file. (*Id.* at p. 1277.) After reviewing the confidential information in camera, the superior court found it to be relevant and reliable, but nevertheless ordered that the prison warden choose between producing unredacted copies of the confidential information to the inmate or opposing the habeas petition without relying on the confidential information. (*Id.* at p. 1280.) The court of appeal granted the warden's petition for a writ of mandate seeking relief from such order. The court reasoned that certain prison inmate records were subject to the official information privilege of Evidence Code section 1040[2] because there is a valid state interest in keeping those

---

[2]      Evidence Code section 1040 states, in pertinent part, that "[a] public entity has a privilege to refuse to disclose official information, and to prevent another from

records confidential to "(1) protect individuals, including informants inside and outside of prison, (2) ensure institutional security, and (3) encourage candor and complete disclosure of information concerning inmates from both public officials and private citizens." (*Ibid.*) The court further explained that, while the official information privilege was "not absolute" and "may only be exercised within the parameters delineated by *Prewitt*," the "*Prewitt* rationale does not apply if 'a disclosure will impose a risk of harm to some informant.'" (*Id*. at p. 1282.) Because the information sought in *Ochoa* "(1) was clothed with the indicia of confidentiality and therefore conditionally privileged, and (2) came from prison inmate informants who would necessarily be endangered if their identities were disclosed," the superior court abused its discretion in ordering either the disclosure of, or non-reliance on, such confidential information. (*Id*. at 1283.)

The appellate court in *Ochoa* also concluded that the "in camera hearing procedure provided for in Evidence Code section 915, subdivision (b),[3] [was] applicable for the purpose of having the [w]arden assist the superior court in determining how much of the confidential information can be disclosed to [the inmate's] counsel." (*Ochoa, supra*, 199

disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and . . . [¶] (2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice." (Evid. Code, § 1040, subd. (b)(2).) "Official information" is defined by the statute as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (Evid. Code, § 1040, subd. (a).)

[3]     Evidence Code section 915, subdivision (b) provides that "[w]hen a court is ruling on a claim of privilege under Article 9 (commencing with Section 1040) of Chapter 4 . . . and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and any other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither the judge nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers."

Cal.App.4th at p. 1283.) Citing *Olson*, the court stated that it "'deem[ed] such procedure to be an expedient one in view of the need to balance the respective rights of [the inmate] and the state in accordance with the views articulated in *Prewitt*.'" (*Ibid*.) The court issued a peremptory writ of mandate directing the superior court to vacate its prior order and to set an in camera hearing with the warden "for the purpose of thereafter disclosing – only to [the inmate's] counsel – as much of the confidential information that can be disclosed without revealing informants' identities." (*Id*. at p. 1284; see also *In re Muszalaski* (1975) 52 Cal.App.3d 475, 482-483 [where inmate sought to inspect his prison file in preparation for a parole suitability hearing, the trial court had discretion under Evidence Code section 915, subdivision (b) to conduct an in camera review of documents designated as confidential by the Department of Corrections].)

Carrillo asserts that, under *Prewitt*, the Governor had to choose to either disclose the confidential information in his prison file to Carrillo and his counsel, or refrain from using any such information in determining Carrillo's suitability for parole. Carrillo is correct that the use of such confidential information, without providing Carrillo any basis to challenge, or even understand, its interpretation, raises significant issues. However, *Prewitt* makes clear that the disclosure of confidential information is not required "when an informant will be exposed to an undue risk of harm." (*Prewitt, supra*, 8 Cal.3d at p. 476; see also *Ochoa, supra*, 199 Cal.App.4th at p. 1282 ["*Prewitt* rationale does not apply if 'a disclosure will impose a risk of harm to some informant'"].) Contrary to Carrillo's characterization, *Prewitt* does not mandate an all-or-nothing approach to the use of confidential information in parole decisions, but rather recognizes that an inmate's interest in obtaining liberty must be balanced against the state's interest in preserving inmate safety and institutional security. We likewise reject Carrillo's argument that, under *Ochoa*, the Governor was precluded from using confidential information to review the Board's parole decision unless he first afforded Carrillo's attorney an opportunity to review such information in an in camera proceeding. The in camera hearing endorsed in *Ochoa* was an ex parte proceeding under Evidence Code section 915, subdivision (b), which would be conducted by the superior court, not by the Governor or the Board.

16

Moreover, the purpose of the in camera proceeding was to ascertain what information could be disclosed to the inmate's attorney without jeopardizing the safety of informants, and thus neither the inmate nor his attorney could be present at such hearing. While Carrillo questions how the superior court could make an informed judgment about the confidentiality of the withheld documents, the *Ochoa* court observed that in balancing the respective rights of the parties, "both [the inmate] and the state must, of necessity, put their trust and faith in the judiciary." (*Ochoa, supra,* at p. 1283.)

In this case, the superior court complied with the procedural safeguards articulated in *Prewitt, Olson,* and *Ochoa* in ruling on Carrillo's petition for a writ of habeas corpus. The court conducted an in camera review of the confidential documents in Carrillo's central file, which had been submitted under seal by the Attorney General. Based on its in camera review, the superior court concluded that the information "is 'clothed with an indicia of confidentiality' and cannot be disclosed without jeopardizing institutional or inmate safety."

Moreover, after Carrillo filed a new habeas petition with this court, we also granted the Attorney General's request to file under seal confidential documents from Carrillo's central file, and we have conducted an independent review of the sealed record. We conclude that the Department of Corrections and Rehabilitation (Department) had a reasonable basis for classifying the documents as confidential and did not act in an arbitrary or capricious manner in making those classifications. (Cal. Code Regs., tit. 15, § 3321, subd. (a) [information to be classified as confidential includes "[i]nformation which, if known to the inmate, would endanger the safety of any person" and "[i]nformation which would jeopardize the security of the institution"]; *In re Muszalaski, supra,* 52 Cal.App.3d at p. 481 ["Department's judgment that disclosure of the information would endanger other persons, if not arbitrary or unreasonable, may constitute a sufficient basis for classifying a document as confidential and precluding its inspection"].) While Carrillo suggests that redacted versions of the documents should have been provided to him and his attorney, we conclude that merely redacting the names of informants or other individuals would not be sufficient to protect them from an undue risk of harm because

17

these individuals could still be identified based on the contents of the documents. Under these circumstances, the Governor's use of undisclosed confidential information in reviewing the Board's parole decision did not violate Carrillo's due process rights.

## IV. The Governor's Decision to Reverse the Board's Grant of Parole was Supported by Some Evidence of Current Dangerousness

Carrillo also asserts that the record fails to support the Governor's determination that he currently presents an unreasonable risk of danger to society and is therefore unsuitable for parole. In particular, Carrillo argues that the Governor's finding that the confidential information in his central file was deemed credible and reliable is facially false because Carrillo was never validated as a prison gang member notwithstanding two independent investigations into his alleged prison gang activity. Carrillo further claims that the Governor's finding that he has been active in the Mexican Mafia prison gang was not a lawful reason to deny him parole because such purported gang activity was not a prior convicted offense under Penal Code section 3041, subdivision (b).

In reversing the Board's grant of parole, the Governor set forth two specific reasons for concluding that Carrillo currently posed an unreasonable risk of danger to society if released from prison: (1) the aggravated circumstances of the commitment offense, and (2) Carrillo's involvement in prison gang activity during his incarceration and his failure to be forthcoming about it. Carrillo does not dispute that there is some evidence to support the Governor's finding that the commitment offense was carried out in an especially heinous, atrocious, or cruel manner. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Carrillo and a fellow gang member drove into a rival gang's territory, and as an act of retaliation, committed a drive-by shooting of two rival gang members who happened to be nearby, one of whom was in a wheelchair. The crime thus involved multiple victims, a calculated killing, and a motive that was trivial in comparison to the magnitude of the offense. However, "the circumstances of the commitment offense . . . establish unsuitability if, and only if, those circumstances are probative of the determination that a prisoner remains a danger to the public." (*Lawrence*, *supra*, 44

18

Cal.4th at p. 1212.) The question before us is whether there was some evidence to support the Governor's conclusion that Carrillo's reported involvement in prison gang activity and lack of credibility in denying it, together with the gravity of the commitment offense, were probative of his current dangerousness.

Bearing in mind the extremely limited and deferential standard of judicial review in parole suitability cases, we conclude there is some evidence in the record to support the Governor's determination that Carrillo remains a danger to the public if released from prison. In reversing the Board's grant of parole, the Governor stated that he was "troubled by confidential information in Mr. Carrillo's prison file that indicates he has been active in the Mexican Mafia prison gang," and noted that "numerous sources have reported that Mr. Carrillo was not only a member of the Mexican Mafia, but fairly recently in a leadership position for the gang at one prison." As the superior court found in its in camera review of the confidential information, and our review confirmed, the Governor's statement that Carrillo was a member of the Mexican Mafia and held a leadership position in the gang is not supported by the record. None of the confidential documents filed under seal indicate that Carrillo was a member of the Mexican Mafia or occupied a leadership position in the gang. On the other hand, the documents do reflect that multiple sources have reported that, at times during his incarceration, Carrillo has directed and performed gang activities within the prison for the benefit of the Mexican Mafia, and has communicated with members of the Mexican Mafia in furtherance of the gang's activities. Accordingly, while the Governor's decision overstates the role Carrillo reportedly has occupied in the Mexican Mafia, the record does support the central finding that Carrillo has had contact with and been engaged in gang-related activity on behalf of the Mexican Mafia during his incarceration, despite adamantly denying at his parole hearing that he has had any contact or involvement with the gang.

Given the circumstances of Carrillo's commitment offense, which involved gang violence, the Governor reasonably could find that Carrillo's participation in prison gang activity and failure to be forthcoming about it was probative of his current dangerousness. While not every breach of prison rules will support a finding of unsuitability, an inmate's

19

misconduct in prison can provide "some evidence he [is] unsuitable for parole because he [will] not comply with the reasonable conditions of parole." (*In re Reed* (2009) 171 Cal.App.4th 1071, 1084 [inmate's history of institutional misconduct and violation of a specific conduct directive from the Board supported the denial of parole].) Institutional misconduct, particularly when the inmate fails to offer a credible explanation for it, also can support a finding that "the circumstances of the commitment offense continue to be predictive of current dangerousness despite the many positive factors that demonstrate [his] suitability for parole." (*In re Hare* (2010) 189 Cal.App.4th 1278, 1295 [inmate's possession of altered toothbrush in violation of prison rules supported the Governor's reversal of a grant of parole].) In this case, the Governor considered not only Carrillo's prior involvement in prison gang activity, but also his statements to the Board adamantly denying any such involvement despite the extent of evidence to the contrary. The Governor found that both the "gang activity and failure to be forthcoming about it show that [Carrillo] is not yet committed to turning away from gangs and his violent lifestyle, and therefore remains a risk to society." The Governor's decision reflects that he gave due consideration to the relevant factors in determining Carrillo's suitability for parole and reasonably concluded that, at this time, Carrillo's commitment offense, his actions while incarcerated, and his failure to acknowledge his prison gang activity demonstrated that he remained a danger to the public if released from prison.

Carrillo contends that the Governor's decision cannot stand because it was predicated on a faulty factual premise. Specifically, Carrillo claims that, because he was never validated as a member of the Mexican Mafia despite two separate investigations by prison officials and the Board, the Governor could not find the confidential information in his central file to be reliable or credible. In support of this argument, Carrillo points out that, in 2007, he was placed in administrative segregation while being investigated by institutional gang investigators for his possible involvement in gang activity, but he was subsequently returned to the general prison population without being validated as a prison gang member or associate or charged with any disciplinary violation. Carrillo also notes that, in 2013, the Board's investigations unit conducted an independent review of the

20

confidential information in his file for evidence that might impeach his denial of any prison gang activity, and following such review, the Board found that Carrillo was suitable for parole. Based on these investigations, Carrillo asserts he was "exonerate[ed] by prison officials of the 'confidential' allegations" concerning his gang activity, and thus, the Governor's mere "belief" that Carrillo was involved in prison gangs is insufficient to support the denial of parole. Carrillo's argument lacks merit.

As the trial court correctly observed, Carrillo improperly conflates the standard for validating an inmate's membership in a prison gang with the standard for denying parole. Under the applicable regulations, "[t]he validation of either a gang member or associate requires the recognition of three reliable source items indicative of active association with the gang, and at least one of those sources must constitute a direct link to a current or former validated gang member or associate." (*In re Fernandez* (2013) 212 Cal.App.4th 1199, 1205; see Cal. Code Regs., tit. 15, § 3378.2.) The Governor's parole decision, however, need only be supported by some evidence in the record showing that the inmate remains a threat to public safety, and like the Board, the Governor must consider "[a]ll relevant, reliable information" that "bears on the [inmate's] suitability for release." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Conduct that does not rise to the level of gang membership for the purpose of validating an inmate as a prison gang member may nevertheless constitute evidence of prison gang activity for the purpose of evaluating an inmate's current dangerousness. Here, the Department determined that the confidential information in Carrillo's prison file satisfied the requirements of reliability under Title 15, section 3321 of the regulations,[4] and such determination must be upheld unless it is

---

[4] Under the regulation, a confidential source's reliability may be established by one or more of the following criteria: "(1) The confidential source has previously provided information which proved to be true. [¶] (2) Other confidential source[s] have independently provided the same information. [¶] (3) The information provided by the confidential source is self-incriminating. [¶] (4) Part of the information provided is corroborated through investigation or by information provided by non-confidential sources. [¶] (5) The confidential source is the victim. [¶] (6) This source successfully completed a polygraph examination." (Cal. Code Regs., tit. 15, § 3321, subd. (c).)

21

arbitrary, capricious, or unreasonable. (*In re Villa* (2013) 214 Cal.App.4th 954, 969.) Based on our review of the sealed record, the Department did not act in an arbitrary, capricious, or unreasonable manner in finding that the confidential information in Carrillo's file was reliable. The fact that the confidential information did not result in Carrillo's validation as a gang member did not thereby render the information unreliable or lacking in credibility, nor did it preclude the Governor from weighing the information differently than the Board in determining whether Carrillo was suitable for parole.[5]

Carrillo also argues that the Governor could not base the denial of parole on Carrillo's prison gang activity because such activity was not a "current or past convicted offense," as required by Penal Code section 3041, subdivision (b). That statute provides that an inmate who has reached his minimum eligible parole release date may not be denied parole "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." (Pen. Code, § 3041, subd. (b).) Contrary to Carrillo's interpretation, the statute does not require the Board or the Governor to only consider offenses for which the inmate has been convicted in assessing his or her current dangerousness. Rather, "when evaluating whether an inmate continues to pose a threat to public safety, both the Board and the Governor must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*Lawrence*, *supra*, 44 Cal.4th at p. 1219.)

---

[5] Contrary to Carrillo's characterization, the Board did not "exonerate" him of any allegations of prison gang activity in finding him suitable for parole. Rather, in rendering its decision to grant Carrillo parole, the Board simply stated that the "[c]oncerns which [it] had regarding information contained within these documents have, in [its] judgment, been addressed by the investigation which was completed at [its] request." While the Governor was required to consider the same factors that guided the Board in its parole suitability decision, the Governor "had the discretion to be 'more stringent or cautious' in determining whether [Carrillo] poses an unreasonable risk to public safety" (*Lawrence*, *supra*, 44 Cal.4th at p. 1204), and reasonably could conclude that the confidential information in Carrillo's prison file was probative of current dangerousness.

The statutory factors tending to show unsuitability for parole include evidence that "[t]he prisoner has engaged in serious misconduct in prison or jail," even if such conduct did not result in a conviction. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) "'[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor.'" (*Lawrence*, *supra*, at p. 1204.)

Carrillo further asserts that if the Governor is entitled to rely on undisclosed confidential information in determining his suitability for parole, Carrillo will never be able to overcome the factors showing unsuitability because the confidential information in his prison file will perpetually constitute "some evidence" of his alleged prison gang activity, and thus "act as a permanent bar to his liberty." As our Supreme Court has observed, however, "in directing the [parole authority] to consider the statutory factors relevant to suitability, many of which relate to postconviction conduct and rehabilitation, the Legislature explicitly recognized that the inmate's threat to public safety could be minimized over time by changes in attitude, acceptance of responsibility, and a commitment to living within the strictures of the law." (*Lawrence, supra*, 44 Cal.4th at p. 1219.) Hence, while "'the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, . . . some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety.'" (*Shapitus I, supra*, 44 Cal.4th at p. 1255; see, e.g., *Lawrence, supra*, at p. 1224 ["reliance upon outdated psychological reports . . . does not supply some evidence justifying . . . conclusion that petitioner continues to pose a threat to public safety"]; *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1490 ["where . . . a stale negative psychological evaluation is superseded by subsequent positive evaluations, the previous negative evaluation does not constitute evidence that the inmate poses a current danger to the public"].) In this case, the Governor reasonably could find that Carrillo's history of prison gang activity, in light of the gravity of the commitment offense and in conjunction with his failure to be forthcoming about such activity at his parole hearing, was probative of his current dangerousness. At some point, however, if there is affirmative evidence,

based upon his subsequent behavior, rehabilitation efforts, or mental state, that Carrillo would not pose a threat to public safety if released, then his history of prison gang activity may no longer be a reliable indicator of his current dangerousness justifying the denial of parole.

In sum, while there are many positive factors in the record that demonstrate Carrillo's suitability for parole, there is at least a modicum of evidence supporting the Governor's determination that Carrillo continues to pose an unreasonable risk to public safety. Because the record reflects that the Governor gave due consideration to all of the relevant statutory factors and there is some evidence to support the conclusion that Carrillo is not suitable for parole, the Governor's decision to reverse the Board's grant of parole must be upheld. We therefore deny Carrillo's petition for a writ of habeas corpus.

## DISPOSITION

The petition is denied.


ZELON, J.


We concur:


PERLUSS, P. J.


STROBEL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.